[No. 45727.   En Banc.   May 31, 1979.]

G. WALTER GATES, ET AL, *Petitioners,* v. CARL D. JENSEN, ET AL, *Respondents.*

. *Helsell, Fetterman, Martin, Todd `& Hokanson* and *Richard S. White,* for petitioners.

*Williams, Lanza, Kastner & Gibbs, Henry E. Kastner,* and *Joel D. Cunningham,* for respondents.

*Daniel F. Sullivan* and *Donovan R. Flora* on behalf of Washington Trial Lawyers Association, amici curiae.

HOROWITZ, J.—Petitioners in this suit for malpractice raise two important questions regarding a physician's duties of care and disclosure to a patient, and the rules of law which apply when a physician allegedly breaches that duty. The first question is whether the doctrine of informed consent requires a physician to inform a patient of a bodily abnormality discovered during a routine examination and of diagnostic procedures which may be taken to determine the significance of that abnormality. The second question raised is whether the rule of *Helling v. Carey,* 83 Wn.2d 514, 519 P.2d 981, 67 A.L.R.3d 175 (1974), that reasonable prudence may require a standard of care higher than that exercised by the relevant professional group, prevails even after the enactment of RCW 4.24.290. We answer both these questions affirmatively, reverse the trial court, and remand for a new trial.

In May 1972 petitioner Elisabeth Gates consulted Dr. James Hargiss, an ophthalmologist with the respondent Eye Clinic of Seattle. She complained of difficulty in focusing, blurring, and gaps in her vision. Mrs. Gates was 54 years old at the time and had a severe myopia which doubled her risk of glaucoma. Dr. Hargiss took eye pressure readings with a Schiotz tonometer and found the pressure in each eye registered 23.8 on the Goldman scale. This reading indicated Mrs. Gates was in the borderline area for glaucoma. Dr. Hargiss then examined Mrs. Gates' optic nerves with a direct ophthalmoscope to determine whether the discs, or surfaces, of the nerves showed the exacerbated "cupping" which is characteristic of glaucoma. There was evidence at trial that observation of the nerve discs in Mrs. Gates' case was particularly difficult with the direct ophthalmoscope when the pupils were not dilated. Nonetheless Dr. Hargiss did not dilate Mrs. Gates' pupils. He could see no evidence of abnormality and made no further tests for glaucoma. In response to Mrs. Gates' inquiry about the

pressure test, he said he had checked for glaucoma but found everything all right. He diagnosed her problem as difficulties with the contact lenses she wore and treated her accordingly.

The significant facts in this case are that Dr. Hargiss neither told Mrs. Gates he had found high pressure in both eyes which put her in a borderline glaucoma area, nor that her risk of glaucoma was increased considerably by this high pressure and her myopia. Furthermore, Dr. Hargiss had available to him two additional diagnostic tests for glaucoma which are simple, inexpensive, and risk free. The first was to use the standard drops for dilating the pupils to obtain a better view of the optic nerve discs. The second was to have Mrs. Gates take a visual field examination to determine whether she had suffered any loss in her field of vision. Dr. Hargiss did not tell Mrs. Gates of the existence of these simple procedures, and he did not administer the tests.

Over the next 2 years Mrs. Gates revisited the clinic 12 times complaining of blurring, fog, and gaps in her vision, as well as loss in visual acuity. Shortly after her first visit Dr. Hargiss made another pressure reading and found pressures in both eyes to be within the high range of normal. There was evidence at trial that in the early stages of glaucoma pressures can vary drastically from normal to positive glaucoma readings within a 24–hour period. Dr. Hargiss concluded, however, that the first high readings were misleading because they were caused by Mrs. Gates' tension at being subjected to the pressure testing procedure, which requires placing the instrument directly on the eye. Adhering to Dr. Hargiss' initial diagnosis of difficulty adjusting to contact lenses, the doctors at the clinic did not dilate the pupils nor administer a visual field test over the next 2 years. Mrs. Gates' symptoms gradually worsened.

In April 1974 doctors at the clinic diagnosed Mrs. Gates as having open angle glaucoma. This diagnosis was confirmed by other specialists outside the clinic. The clinic's own glaucoma expert suggested that part of Mrs. Gates'

vision loss was attributable to an acute nerve disease which is untreatable and could not have been detected before it occurred.[1] This finding was made at a time when Mrs. Gates' glaucoma had already been diagnosed and the clinic's expert had access to the records indicating that dilation and field examinations had not been previously made. The diagnosis of nerve disease was contested at trial by other expert testimony. By the time Mrs. Gates' glaucoma was discovered her vision had deteriorated from near 20/20 with glasses to 20/200 with glasses. Mrs. Gates is now functionally blind.

At trial petitioners requested instructions on the doctrine of informed consent and the reasonable prudence rule established by this court in *Helling v. Carey, supra.* The court refused both instructions. The jury reached a verdict for the respondent doctors and the court entered judgment accordingly. The Court of Appeals considered five assignments of error and affirmed the judgment for respondents. We granted the petition for review of the trial court's refusal to give the two requested instructions.

We reverse.

### INFORMED CONSENT

Petitioners' proposed supplemental instruction No. 2[2] is based on the evidence presented at trial that the doctors at the Eye Clinic failed to inform Mrs. Gates that she had

---

[1]Respondents contend the nerve disease resulted from a series of strokes allegedly suffered by Mrs. Gates early in 1974. We need not consider this proximate cause question or the sufficiency of the evidence to establish the strokes claimed because we conclude petitioners are entitled to instructions supported by their own version of the facts.

[2]Petitioners' proposed supplemental instruction No. 2 reads as follows:

"You are instructed that an ophthalmologist has a duty to advise his patient of all relevant, material information concerning the condition of the patient's eyes that the patient will need to make an informed decision respecting the alternative methods of examination for eye disease, of the reasonably foreseeable risks of each alternative, and of no such examination at all. Failure to so advise the patient is negligence.

"The plaintiff–patient must prove the following elements to establish a case of negligence against the ophthalmologist for failing to impart information so the

high pressures in her eyes, that she was in a high risk group for glaucoma, or that there were alternative diagnostic procedures available to determine conclusively whether she had glaucoma. It is petitioners' contention that the doctors had a duty to tell her these facts so she could make an informed choice about treatments she would undergo, and that if she had been informed of these facts she would have requested the additional tests and glaucoma would have been discovered. There was evidence at trial that if glaucoma had been detected when Mrs. Gates first visited the Eye Clinic, the condition could have been stabilized and a great part of her vision saved. It is respondents' contention, however, that the doctrine of informed consent does not apply to questions of appropriate diagnostic procedures and the requested instruction was properly rejected. We do not agree.

■ In a thorough and comprehensive statement of the doctrine of informed consent which was adopted by this court, the Court of Appeals held that a physician has a fiduciary duty to inform a patient of abnormalities in his or her body. *Miller v. Kennedy,* 11 Wn. App. 272, 282, 522 P.2d 852 (1974), *affirmed,* 85 Wn.2d 151, 530 P.2d 334 (1975). The basis of this duty is that the patient has a right to know the material facts concerning the condition of his or her body, and any risks presented by that condition, so that an informed choice may be made regarding the course which the patient's medical care will take. The patient's right to know is not confined to the choice of treatment once a disease is present and has been conclusively diagnosed. Important decisions must frequently be made in

course of examination could be chosen intelligently: (1) The defendant–doctor failed to inform the plaintiff–patient of the condition of the patient's eyes, of the availability of alternative examination procedures for detecting eye disease, of the reasonably foreseeable material risks of each alternative, and of no examination at all. (2) A reasonable person in the plaintiff–patient's position would have chosen a different course of examination had the alternatives and the material risks of each been made known. (3) The plaintiff has been injured as a result of submitting to the course of examination proposed by the physician."

many nontreatment situations in which medical care is given, including procedures leading to a diagnosis, as in this case. These decisions must all be taken with the full knowledge and participation of the patient. The physician's duty is to tell the patient what he or she needs to know in order to make them. The existence of an abnormal condition in one's body, the presence of a high risk of disease, and the existence of alternative diagnostic procedures to conclusively determine the presence or absence of that disease are all facts which a patient must know in order to make an informed decision on the course which future medical care will take.

Contrary to respondents' contention, application of the doctrine of informed consent to circumstances other than treatment of a diagnosed disease is nothing new. *Miller v. Kennedy* itself involved evaluating the risks of a diagnostic procedure, a kidney biopsy. In *Young v. Group Health Coop.*, 85 Wn.2d 332, 534 P.2d 1349 (1975), the doctrine was applied to a determination whether childbirth should take a natural course, where this question again was not one of treatment of a known disease. *See also Holt v. Nelson*, 11 Wn. App. 230, 523 P.2d 211, 69 A.L.R.3d 1235 (1974). The physician's duty of disclosure arises, therefore, whenever the doctor becomes aware of an abnormality which may indicate risk or danger. *Betesh v. United States*, 400 F. Supp. 238 (D.D.C. 1974). The facts which must be disclosed are all those facts the physician knows or should know which the patient needs in order to make the decision. To require less would be to deprive the patient of the capacity to choose the course his or her life will take.

In this case jury questions were raised as to whether Dr. Hargiss disclosed all the facts which he had a duty to disclose and, if not, whether Mrs. Gates was injured thereby. We conclude the trial court erred in refusing the requested supplemental instruction No. 2.

REASONABLE PRUDENCE IN MEDICAL PRACTICE

Petitioners' requested supplemental instruction No. 3[3] was based on the rule of *Helling v. Carey, supra,* that reasonable prudence may require a standard of practice which is higher than that exercised by the relevant professional community. Respondents contend the *Helling* rule does not apply in this case, and further that the rule was abrogated by RCW 4.24.290. We do not agree.

*Helling v. Carey* was an unusual case. The plaintiff there, like Mrs. Gates, had glaucoma. The evidence showed the disease could have been detected and successfully treated early enough to prevent her severe vision loss if routine pressure tests had been administered when she first reported troubling symptoms to her doctor. The tests were not given, however, because the doctor did not suspect glaucoma and the standard of practice among ophthalmologists at that time was not to give routine pressure tests to persons under the age of 40. The plaintiff was only 32. The pressure tests, which were then routinely given to persons over 40, are simple, inexpensive, reliable and risk free. The court held that reasonable prudence required the use of this test on persons under the age of 40 as well, and that failure to give the test to the plaintiff was negligence. The unusual features of the case included the nature of the disease glaucoma, which may go undetected for years until severe loss of vision is unavoidable, and the existence of a simple and harmless test which can prevent this terrible result.

---

[3]Petitioners' proposed supplemental instruction No. 3 reads as follows:

"Irrespective of whether you find that any defendant met or failed to meet the applicable standard of care followed by practicing ophthalmologists in the diagnosis of glaucoma, if you find that Mrs. Gates had glaucoma and that the statistical risk of sight loss from glaucoma is serious enough in cases such as Mrs. Gates' that reasonable prudence under the circumstances required the administration of additional diagnostic tests before April 22, 1974, you are instructed that failure to perform those tests before that date would constitute negligence. In determining whether reasonable prudence would require giving the tests in question you should consider, among other facts, the cost, ease or difficulty of administration, risk to the patient and relative reliability of the tests in question."

The instant case presents the same unusual features. The disease is the same. The treating physicians had available to them at least two additional diagnostic procedures— dilation of the pupils for a better view of the optic nerve discs, and a vision field examination—which are simple, inexpensive, conclusive and risk free. These tests need only be used when other diagnostic procedures are inconclusive for some reason, or when a red flag of warning has been raised by some abnormality suggesting the risk of glaucoma. When a patient's condition does indicate the necessity for further examination, however, reasonable prudence requires the use of the alternative tests.

■ The evidence in this case showed that Mrs. Gates' physical condition—her severe myopia and her initial borderline glaucoma pressure readings—indicated a high risk of glaucoma. Other evidence tended to show Dr. Hargiss complied with the applicable professional standard of care by examining Mrs. Gates' optic nerve discs with a direct ophthalmoscope. A jury could find, however, that where the risk of glaucoma was high and the pressure tests arguably inconclusive, reasonable prudence required the physician to dilate the pupils for a better view of the optic nerve discs and administer a visual field examination. The doctrine of *Helling v. Carey,* that reasonable prudence may require a higher standard of care applies; petitioners were entitled to have their proposed instruction given to the jury.

Respondents contend, though, that the *Helling* rule was abrogated by legislative enactment. RCW 4.24.290 provides, in part:

> In any civil action for damages based on professional negligence against . . . a member of the healing arts . . . the plaintiff in order to prevail shall be required to prove by a preponderance of the evidence that the defendant or defendants failed to exercise that degree of skill, care and learning possessed by other persons in the same profession . . .

The original house bill would have established the standard of care as that skill and care practiced by others in the

same profession and specialty. House Bill No. 246, 44th Legislature (1975). Respondent contends the clear intent of this bill was to abrogate the *Helling* rule. The original bill was amended though. The statute as passed requires physicians to exercise the skill, care and learning *possessed* by others in the same profession. This standard is much broader than the one embodied in the original bill, and allows ample scope for the application of the limited *Helling* rule. It is not argued that respondent and other ophthalmologists did not possess the skill, care and learning required to choose and administer the two alternative, simple and risk–free tests. We therefore find no bar to the requested instruction under RCW 4.24.290.

The judgment is reversed and the case remanded for a new trial.

UTTER, C.J., and ROSELLINI, STAFFORD, WRIGHT, BRACH-TENBACH, and WILLIAMS, JJ., concur.

DOLLIVER, J. (concurring in part, dissenting in part)—I do not quarrel with the analysis and result of the majority on the issue of informed consent. I do disagree, however, with its position on reasonable prudence in medical practice.

Proposed supplemental instruction No. 3 is taken directly from *Helling v. Carey,* 83 Wn.2d 514, 519 P.2d 981, 67 A.L.R.3d 175 (1974). *See* Schwartz & Komesar, *Doctors, Damages and Deterrence: An Economic View of Medical Malpractice,* 298 New Eng. J. of Med. 1282 (June 1978). Supplemental instruction No. 3 reads:

> Irrespective of whether you find that any defendant met or failed to meet the applicable standard of care followed by practicing ophthalmologists in the diagnosis of glaucoma, if you find that Mrs. Gates had glaucoma and that the statistical risk of sight loss from glaucoma is serious enough in cases such as Mrs. Gates' that reasonable prudence under the circumstances required the administration of additional diagnostic tests before April 22, 1974, you are instructed that failure to perform those

tests before that date would constitute negligence. In determining whether reasonable prudence would require giving the tests in question you should consider, among other factors, the cost, ease or difficulty of administration, risk to the patient and relative reliability of the tests in question.

The issue in *Helling* and in this case is the standard of care to be applied by the jury in measuring the defendants' conduct. The standard of care is a rule of law which provides the trier of fact with the controlling test for negligence. W. Prosser, *Law of Torts* §§ 32–33 (4th ed. 1971). In most negligence actions, the standard of care to which the defendant must conform is that degree of care which, in the jury's view, a reasonable person of ordinary prudence would have exercised in the defendant's place in the same or similar circumstances. Prosser, § 32, at 150. In medical malpractice actions, however, the standard of care traditionally has been that degree of skill, care and learning which is possessed and exercised by members of the medical profession in good standing. Prosser, § 32, at 162; *Pederson v. Dumouchel,* 72 Wn.2d 73, 431 P.2d 973, 31 A.L.R.3d 1100 (1967); *Derr v. Bonney,* 38 Wn.2d 678, 231 P.2d 637, 54 A.L.R.2d 193 (1951); *Fritz v. Horsfall,* 24 Wn.2d 14, 163 P.2d 148 (1945). In short, the standard of care generally has been held to be the standard of the profession. Note, 51 Wash. L. Rev. 167, 169 (1975).

In *Helling,* however, we held that, regardless of the standards of the profession of ophthalmology, reasonable prudence required the "timely giving of this simple, harmless pressure test [for glaucoma] to this plaintiff and that, in failing to do so, the defendants were negligent." Citing Judge Learned Hand, we quoted with approval his observation that *"Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission".* The T.J. *Hooper,* 60 F.2d 737 (2d Cir. 1932); *Helling,* at 519. The *Helling* decision represented a deviation from the "standard of the profession" test used in medical malpractice

actions. It rested on the "reasonably prudent person" standard which is applied in ordinary tort cases. *Texas & Pac. Ry. v. Behymer,* 189 U.S. 468, 47 L. Ed. 905, 23 S. Ct. 622 (1903), and *The T.J. Hooper, supra* (both involving commercial cargo carriers and industry–wide disregard of needed safety precautions). *See* Note, 10 Gonzaga L. Rev. 220 (1974).

In 1975, the legislature considered and passed Substitute House Bill No. 246—RCW 4.24.290. The purpose of the bill was stated in the bill report of the House Committee on Judiciary, 44th Legislature, 1st Ex. Sess. That report said:

Purpose of Bill and Effect on Existing Law: This bill is occasioned by a recent holding by the Wash. State Supreme Court regarding the standard of care required of physicians. In *Helling v. Carey* the court held that in a malpractice suit it is sufficient for plaintiff to prove that the physician failed to provide reasonable and prudent care in light of all of the circumstances—even though he in fact adhered to that standard of care expected of the average practitioner in his field. *Helling* says, regardless of established practice, if the facts involved indicate that a certain duty to perform should exist then the professional is liable for breaches of that duty. The bill as introduced would re–establish the pre–*Helling* standards of negligence that have been developed through case law in Washington. (See *Pederson v. Dumouchel* [72 Wn.2d 73, 431 P.2d 973 (1967)] and *Hayes v. Hullwit* [73 Wn.2d 796, 440 P.2d 849 (1968)][)].

Effect of SUBSTITUTE BILL: Requires medical malpractice plaintiff to show that defendant failed to exercise the degree of skill, care and learning possessed by others in the same profession and that such failure caused damages. Excludes from this requirement actions based on failure to obtain informed consent of a patient.

The question is whether this purpose was successfully accomplished.

The majority points out that the original bill referred to the "skill and care *practiced* by others in the same profession" (italics mine), while Substitute House Bill No. 246, now RCW 4.24.290, substitutes the word *possessed* for *practiced.* Without explaining further, the majority simply

asserts "This standard is much broader than the one embodied in the original bill, and allows ample scope for the application of the limited *Helling* rule. It is not argued that respondent and other ophthalmologists did not possess the skill, care and learning required to choose and administer the two alternative, simple and risk–free tests." I do not believe that the change of the word "practiced" to "possessed" frustrated the legislature's purpose in enacting RCW 4.24.290. The issue is not whether members of the profession possessed, practiced, followed (*Helling v. Carey, supra;* RCW 7.70.030) or exercised (RCW 7.70.040) a certain degree of skill. Rather, it is whether the standard of the profession should be used to measure the defendants' conduct instead of the *Helling* standard of "reasonably prudent under the circumstances."

RCW 4.24.290 says that a "plaintiff in order to prevail shall be required to prove by a preponderance of the evidence that the defendant or defendants failed to exercise that degree of skill, care and learning possessed by other persons in the same profession". Plaintiffs' proposed supplemental instruction No. 3 says that even if the defendants met "the applicable standard of care followed by practicing ophthalmologists in the diagnosis of glaucoma" the jury could still find defendants negligent. This is absolutely contrary to the mandate of the legislature. The plaintiff must prove a violation of the standard of the profession. Failure to do so bars recovery.

The trial court did not commit error in refusing to give the instruction.

HICKS, J., concurs with DOLLIVER, J.

Reconsideration denied August 21, 1979.