[No. 30098-6-III.    Division Three.    December 11, 2012.]

RODOLFO ANAYA GOMEZ, *as Personal Representative, Appellant,* v. MARK F. SAUERWEIN ET AL., *Respondents.*

*Richard R. Johnson* (of *Delorie Johnson PLLC*), for appellant.

*David A. Thorner* and *Megan Murphy* (of *Thorner Kennedy & Gano PS*), for respondents.

¶1 SIDDOWAY, A.C.J. — Thirty-two-year-old Christina Palma Anaya died of fungal sepsis. Her estate appeals the trial court's dismissal of its claim that Mark Sauerwein, MD, failed to obtain Ms. Anaya's informed consent to the doctor's decision to await a final blood test before acting on a preliminary test identifying yeast in her blood, which the doctor concluded must be in error. The estate's alternative claim of medical negligence, asserting misdiagnosis by Dr. Sauerwein, was rejected by a jury.

¶2 At the heart of the parties' disagreement is whether the decision in *Gates v. Jensen*, 92 Wn.2d 246, 595 P.2d 919 (1979) represents a continuing exception to the statement in *Backlund v. University of Washington*, 137 Wn.2d 651, 975 P.2d 950 (1999) that when a doctor misdiagnoses a patient's condition, the patient can bring only an action for medical negligence, not one for failure to secure informed consent. We hold that it does not. *Gates* must be regarded at this point as having been abrogated or limited to its facts by the five-member concurring opinion in *Keogan v. Holy Family Hospital*, 95 Wn.2d 306, 622 P.2d 1246 (1980) or overturned, sub silentio, by later decisions of the Supreme Court. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶3 Christina Anaya was diagnosed with type two diabetes when she was 19 or 20 years old and by 2006, at age 32, had been a long-standing patient of the Yakima Valley Farm Workers Clinic. Her blood sugar was poorly controlled, leaving her immunocompromised. Kyle Heisey, MD, a physician employee of the defendant clinic, was her primary physician.

¶4 On Sunday, August 20, 2006, Ms. Anaya traveled to the emergency department of Toppenish Community Hospital, complaining of symptoms consistent with a urinary tract infection (UTI). She was admitted to the hospital, a urine culture was taken, and blood was drawn and for-

warded to a laboratory for routine testing. She was discharged from the hospital the next day with a diagnosis of UTI, after the urine culture showed she was growing Gram-negative rods. The culture was verified to be the bacterial organism Klebsiella pneumoniae on August 22. Ms. Anaya returned to the hospital on Wednesday, August 23, because she was not feeling well and could not empty her bladder. She was evaluated and treated, but not admitted to the hospital. Dr. Sauerwein was not involved in any of these events.

¶5 On Thursday, August 24, a microbiologist in the laboratory at the Yakima Regional Medical Center, to whom Ms. Anaya's August 20 blood culture had been sent for analysis, telephoned the Farm Workers Clinic and told Sarah Gott, a registered nurse, that a preliminary report indicated that Ms. Anaya's blood culture was positive for yeast. The culture had not grown out to a point where the strain could be determined. Ms. Gott relayed what she had been told to Dr. Sauerwein, a family practitioner, who was covering for Dr. Heisey.

¶6 Dr. Sauerwein was puzzled by what was conceded by all of the experts to be a rare test result. He consulted with Dr. John Moran, who was board certified in internal medicine and had treated Ms. Anaya in the hospital the prior weekend. Dr. Sauerwein would later testify that he regularly consulted with Dr. Moran about patients, that he trusted him, and that he knew that Dr. Moran had seen Ms. Anaya only days before, which Dr. Sauerwein characterized as "a big advantage." Report of Proceedings (June 10, 2011) at 78. Together, they arrived at a plan to find out how Ms. Anaya was doing and, if she was ill, to take further action. If she was not ill, they agreed that they would wait, because in that event, it was probable that the yeast was a contaminant. The consultation and agreed course of action were reflected in Dr. Sauerwein's clinic note.

¶7 Dr. Sauerwein directed Ms. Gott to contact Ms. Anaya to determine how she was doing. Mary Sifuentes, a licensed

practical nurse at the clinic, called Ms. Anaya, who told the nurse that she had returned to the emergency room the prior night, emergency department personnel had catheterized and emptied her bladder, and she felt much better after that. She was continuing to be treated for a bacterial infection.

¶8 Based on that information, Dr. Sauerwein did not take further immediate action on the blood test result, although upon being told that Ms. Anaya's next scheduled follow-up appointment at the clinic was on September 5, he responded, "[H]ave her come in next week please, 9/5 is too far out." Ex. 7. Ms. Anaya was contacted and rescheduled to return to the clinic on the following Wednesday, August 30. There was no evidence that Dr. Sauerwein or anyone else at the clinic informed Ms. Anaya of the results of the microbiology test.

¶9 It turned out that the blood test was not contaminated; Ms. Anaya did have a fungal infection. It took six days, until Saturday, August 26, for the fungus to grow out and be identified as Candida glabrata. No report of that final finding was received by the clinic.

¶10 On August 29, Ms. Anaya's husband, Rodolfo Anaya Gomez, who was working in Alaska but had learned of his wife's persisting illness, returned to Washington to see to her care. He drove her to Yakima Memorial Hospital on the day he arrived home. Upon being admitted, her urine tested positive for yeast—something it had not done when she was admitted to the Toppenish hospital nine days earlier. Approximately 24 hours after her admission to Yakima Memorial, a consulting nephrologist learned of her fungal infection with Candida, although the strain was not yet identified. He began treating Ms. Anaya with fluconazol, an antifungal medication, but one that does not eliminate Candida glabrata from the blood stream. It was not until a day later, when Ms. Anaya was seen by an infectious disease specialist who learned that her blood culture had grown Candida glabrata, that the fluconazol was discontinued, and she began receiving amphotericin B intravenously.

¶11 Ms. Anaya felt better the next day and was transferred out of the intensive care unit (ICU), but only temporarily. The fungus had invaded her internal organs, and she had developed fungal sepsis. Despite her return to the ICU and aggressive treatment, she eventually fell into a vegetative state, was transferred to a nursing home in Toppenish, and died on November 17, 2006. The cause of death was fungal sepsis.

¶12 Mr. Anaya Gomez, as personal representative of Ms. Anaya's estate, brought suit against Dr. Sauerwein and the clinic for medical negligence, alleging that the doctor had "deviated from the accepted standard of care in the community" in his "evaluation and/or non-treatment" of Ms. Anaya. Clerk's Papers (CP) at 7.

¶13 Three weeks before trial, the estate submitted a notice of trial amendment, adding a claim for failure to obtain informed consent. The defendants objected to the amendment as untimely and because, they argued, an informed consent theory was inapplicable, given the facts of the case. A few days before trial, the court heard defense arguments against permitting the amendment and for an order in limine excluding evidence supporting the informed consent theory. The court entered an order denying the defense motion to exclude evidence in support of the theory "at this time." CP at 296.

¶14 At the close of the estate's case, the defendants renewed their objection to the informed consent claim and moved the court to dismiss it as a matter of law. The court granted the motion. It later denied the estate's request for reconsideration.

¶15 In support of its medical negligence claim, the estate presented expert testimony that the standard of care required that Dr. Sauerwein contact Ms. Anaya upon receipt of the preliminary report, tell her that her blood culture had tested positive for yeast, and advise her to return to the emergency room for evaluation and to have a new blood culture taken and tested.

¶16 Defense experts disagreed, testifying that yeast infections in the blood are so rare that the appropriate standard of care was to contact the patient to determine her clinical condition and, if she was feeling better, to await the final report before administering treatment. The infectious disease expert for the defense also testified that amphotericin B is the only antifungal medication effective against Candida glabrata, is itself toxic, and is especially damaging to the kidneys. He testified that even an infectious disease specialist would not ordinarily put a patient on the drug without having a final identification of Candida glabrata as the infectious organism.

¶17 At the conclusion of the trial on the medical negligence claim, the jury returned a defense verdict. The estate's motions for reconsideration, judgment notwithstanding the verdict (JNOV), and/or for new trial were denied. The estate timely appealed.

## ANALYSIS

### I

¶18 Dr. Sauerwein presents two threshold arguments that the estate has failed to comply with rules of appellate procedure and we should, for that reason, refuse to entertain its arguments.

¶19 He argues, first, that the estate makes arguments not identified in its notice of appeal. A notice of appeal must "designate the decision or part of decision which the party wants reviewed." RAP 5.3(a)(3). However, we review an order or ruling not designated in the notice if it "prejudicially affects the decision designated in the notice" and "is made[ ] before the appellate court accepts review." RAP 2.4(b). An order "prejudicially affects" the decision designated in the notice of appeal where its designated decision would not have occurred in the absence of the undesignated ruling or order. *Right-Price Recreation,*

*LLC v. Connells Prairie Cmty. Council*, 146 Wn.2d 370, 380, 46 P.3d 789 (2002).

¶20 The estate's notice of appeal requests review of the judgment and the order on the estate's posttrial motions (for reconsideration, for JNOV, or for a new trial). Its appeal from the final judgment and posttrial motions brings up for review the trial court's oral ruling dismissing its informed consent theory as a matter of law and refusing to instruct the jury on that theory.

¶21 Second, Dr. Sauerwein argues that the estate has failed to provide us with argument demonstrating how the cases that it cites bear on the facts and circumstances of this case, in violation of RAP 10.3(a)(6). That rule requires that an appellate brief contain "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." RAP 10.3(a)(6). Dr. Sauerwein's principal objection is to the estate's asserted overreliance on extensive block quotes from Washington cases, without articulating why those cases control or bear on the outcome of this appeal.

¶22 The crux of this appeal has almost nothing to do with any dispute over the facts of this case and turns almost entirely on reconciling a handful of reported Washington decisions. A detailed discussion of the key cases is a logical presentation of the estate's argument. We had no problem following the estate's argument on appeal and find no violation of our rules.

## II

¶23 Washington's Supreme Court first recognized the doctrine of informed consent in *ZeBarth v. Swedish Hospital Medical Center*, 81 Wn.2d 12, 499 P.2d 1 (1972), and the legislature thereafter codified the prima facie elements of an informed consent claim in RCW 7.70.050 in 1975. *Stewart-Graves v. Vaughn*, 162 Wn.2d 115, 123, 170 P.3d 1151 (2007). Under the doctrine, a health care provider

has a fiduciary duty to disclose relevant facts about the patient's condition and the proposed course of treatment so that the patient may exercise the right to make an informed health decision. *Id.* at 122-23 (citing *Miller v. Kennedy*, 11 Wn. App. 272, 282, 522 P.2d 852 (1974), *aff'd*, 85 Wn.2d 151, 530 P.2d 334 (1975)). A provider may be liable to an injured patient for breaching this duty even if the treatment otherwise meets the standard of care. *Id.* at 123. "The doctrine of informed consent is based on 'the individual's right to ultimately control what happens to his body.'" *Id.* (quoting *Keogan*, 95 Wn.2d at 313-14).

¶24 The legal issue presented by this appeal is whether the trial court correctly dismissed the estate's informed consent claim on the basis that a health care provider's failure to diagnose, or its misdiagnosis, presents a cause of action for medical negligence only, because no informed consent requirement is triggered.

■■ ¶25 We review a decision on a motion for judgment as a matter of law de novo, applying the same standard as the trial court. *Davis v. Microsoft Corp.*, 149 Wn.2d 521, 530-31, 70 P.3d 126 (2003). Judgment as a matter of law is not appropriate if, after viewing the evidence and reasonable inferences in a light most favorable to the nonmoving party, substantial evidence exists to sustain a verdict for the nonmoving party. *Schmidt v. Coogan*, 162 Wn.2d 488, 491, 173 P.3d 273 (2007). "An order granting judgment as a matter of law should be limited to circumstances in which there is no doubt as to the proper verdict." *Id.* at 493.

■■ ¶26 In successfully moving for judgment as a matter of law, Dr. Sauerwein relied on an extended discussion in *Backlund* of whether misdiagnosis can constitute failure to provide informed consent. The Washington Supreme Court stated in that case:

> A physician who misdiagnoses the patient's condition, and is therefore unaware of an appropriate category of treatments or treatment alternatives, may properly be subject to a negligence action where such misdiagnosis breaches the standard of care,

but may not be subject to an action based on failure to secure informed consent.

137 Wn.2d at 661. It continued, in a footnote,

> In the traditional informed consent case, a physician diagnoses the patient's condition and recommends a course of treatment. The physician is liable under RCW 7.70.050, however, if the physician fails to disclose the attendant risks of such treatment. Similarly, the physician is liable if the physician fails to disclose other courses of treatment, including no treatment at all, as options upon which the patient makes the ultimate choice.
>
> Where a physician arguably misdiagnoses the patient's condition and recommends a course of treatment for the patient based on that misdiagnosis, the physician is properly liable in negligence for the misdiagnosis if such diagnosis breaches the standard of care. But the physician should not be additionally liable under RCW 7.70.050 for a condition unknown to the physician. For example, a physician who misdiagnosed a headache as a transitory problem and failed to detect a brain tumor may be guilty of negligence for the misdiagnosis, but it seems anomalous to hold the physician culpable under RCW 7.70.050 for failing to secure the patient's informed consent for the undetected tumor.

*Id.* at 661 n.2 (citations omitted).

¶27 This discussion of informed consent in *Backlund* was dicta because the court rejected the defense argument that the negligence at issue was misdiagnosis. The action had been brought by the parents of a newborn who suffered brain damage when phototherapy treatment proved ineffective for her hyperbilirubinemia, or jaundice, and who had not been told that only a higher risk treatment—blood transfusion—might be effective in serious cases. Because the neonatologist diagnosed the newborn's hyperbilirubinemia and was aware of the alternative treatments, the Supreme Court held that it was not a case of misdiagnosis, and the plaintiffs were entitled to pursue their theory of lack of informed consent.

¶28 Although dicta, *Backlund*'s discussion of whether misdiagnosis is actionable as a failure to obtain informed consent relies on several reported decisions of this court in which the issue was squarely presented.

¶29 In *Thomas v. Wilfac, Inc.*, 65 Wn. App. 255, 828 P.2d 597, *review denied*, 119 Wn.2d 1020 (1992), cited by *Backlund*, 137 Wn.2d at 659, this court rejected an appellant's argument that the trial court erred in refusing to rule, as a matter of law, that an emergency room doctor failed to secure her informed consent when he failed to inform her of a rejected diagnosis. She had suffered breathing problems after exposure to Malathion. In providing treatment, the doctor did not tell her that he had rejected poisoning by Malathion as the cause of her complaints, and did not explain the risks of Malathion poisoning or its treatment. This court held:

> Dr. Plumley diagnosed Ms. Thomas as suffering from asthma, not Malathion poisoning. He did not treat her for Malathion poisoning. Therefore, he did not have a duty to inform her of the timeframe for administering an antidote or her future risk of developing organophosphate-induced delayed neurotoxicity. . . .
>
> Failure to diagnose a condition is a matter of medical negligence, not a violation of the duty to inform a patient. Informed consent and medical negligence are alternate theories of liability. Here, it is undisputed Dr. Plumley did not diagnose Malathion poisoning. Ms. Thomas has not established that Dr. Plumley failed to inform her of a material fact relating to treatment.

65 Wn. App. at 260-61 (citations omitted). The Supreme Court denied review of this court's decision in *Wilfac*.

¶30 The *Backlund* court's discussion of the proper theory for presenting a claim of misdiagnosis also cited this court's decisions in *Bays v. St. Luke's Hospital*, 63 Wn. App. 876, 825 P.2d 319, *review denied*, 119 Wn.2d 1008 (1992) and *Burnet v. Spokane Ambulance*, 54 Wn. App. 162, 772 P.2d 1027, *review denied*, 113 Wn.2d 1005 (1989).

¶31 In *Burnet*, the plaintiffs had themselves presented expert testimony that the defending doctor was unaware of a condition of the patient implicating risk to her. The Supreme Court in *Backlund* quoted portions of this court's decision agreeing with the trial court that " 'the issues presented were confined to negligence and misdiagnosis rather than a violation of the informed consent law,' " and this court's holding that because of the doctor's lack of awareness, " 'he had no duty to disclose. The Burnets' claim relates solely to issues of failure to meet the standard of care and diagnosis.' " *Backlund*, 137 Wn.2d at 661 (quoting *Burnet*, 54 Wn. App. at 169). The Supreme Court denied review of this court's decision in *Burnet*.

¶32 Finally, the *Backlund* court cited to this court's decision in *Bays*. The Supreme Court characterized *Bays* as involving "[a] patient's attempt to disguise a negligence issue as a failure to obtain an informed consent issue." 137 Wn.2d at 661. It pointed out that in *Bays*, this court held that " '[a] failure to diagnose a condition . . . is a matter of medical negligence,' " adding that " '[w]e decline to create a second or alternate cause of action on informed nonconsent to a diagnostic procedure predicated on the same facts necessary to establish a claim of medical negligence.' " *Id.* (second alteration in original) (quoting *Bays*, 63 Wn. App. at 883). The Supreme Court denied review of this court's decision in *Bays*.

¶33 Against this authority, the estate relies on several older Washington decisions but principally on *Gates* and *Keogan*. *Gates* involved a plaintiff who suffered substantial loss of her eyesight over her two-year treatment by the defending ophthalmologist. After diagnostic pressure tests, the ophthalmologist found that Ms. Gates was in the borderline area for glaucoma in each eye. He made no further tests for glaucoma, although more definitive tests were readily available. He diagnosed her problem as difficulties with her contact lenses because he could see no evidence of abnormality. He rejected later readings of high

pressure in her eyes as misleading, attributing them to Ms. Gates' tension at being subjected to the pressure testing procedure. The trial court refused to instruct the jury on a theory of failure to obtain informed consent.

¶34 The ophthalmologist defended by challenging Ms. Gates' basic assumption that her vision loss was due to glaucoma. Defense evidence suggested it was caused by a stroke or series of strokes. The jury found against Ms. Gates on her medical negligence claim. *Gates v. Jensen*, 20 Wn. App. 81, 83, 579 P.2d 374 (1978), *rev'd*, 92 Wn.2d 246.

¶35 The Court of Appeals rejected Ms. Gates' complaint on appeal that her theory of failure of informed consent should have been submitted to the jury, holding, "The doctrine of informed consent should not be enlarged so as to include problems of mistaken diagnosis. The claim of negligent conduct appropriately covers the fault of a mistaken diagnosis and is sufficient to afford a fair trial on the issue." *Id.* at 87.

¶36 But the Supreme Court accepted review and clearly disagreed. Relying on the reference in *Miller* to the duty of a physician "to inform a patient of abnormalities in his or her body," the *Gates* court held:

> The patient's right to know is not confined to the choice of treatment once a disease is present and has been conclusively diagnosed. Important decisions must frequently be made in many nontreatment situations in which medical care is given, including procedures leading to a diagnosis, as in this case. These decisions must all be taken with the full knowledge and participation of the patient. The physician's duty is to tell the patient what he or she needs to know in order to make them. The existence of an abnormal condition in one's body, the presence of a high risk of disease, and the existence of alternative diagnostic procedures to conclusively determine the presence or absence of that disease are all facts which a patient must know in order to make an informed decision on the course which future medical care will take.

92 Wn.2d at 250-51. It went on to state that "[t]he physician's duty of disclosure arises, therefore, whenever the

doctor *becomes aware of an abnormality which may indicate risk or danger*" and that "[t]he facts which must be disclosed are all those facts the physician knows *or should know* which the patient needs in order to make the decision." *Id.* at 251 (emphasis added).

¶37 *Keogan*, decided a year and a half later, similarly involved a claim by the personal representative of a deceased patient that the treating physician—a general practitioner who had administered a resting electrocardiogram (EKG) and took cardiac enzyme tests after his patient complained of chest pain—should have told the patient about the possibility of an angiogram and a treadmill EKG. This was despite the fact that neither test was used extensively by general practitioners at the time and the patient's symptoms were inconclusive. *Keogan v. Holy Family Hosp.*, 24 Wn. App. 583, 601 P.2d 1303 (1979), *rev'd*, 95 Wn.2d 306. Even upon reconsideration, following the Supreme Court's decision in *Gates*, the Court of Appeals held:

> In a situation involving simple, risk-free procedures which would conclusively determine the presence or absence of glaucoma, the court's comment [in *Gates*] is apropos. But as we noted in *Keogan v. Holy Family Hosp.*[, 22 Wn. App. 366, 589 P.2d 310 (1979)], the symptoms which Keogan exhibited ranged from gastrointestinal problems to heart disease. Dr. Snyder conservatively treated both, but he had neither made a diagnosis nor pursued a course of treatment involving a risk to his patient. Under these circumstances, no duty to inform had yet arisen and no instruction was required.

*Keogan*, 24 Wn. App. at 585-86.

¶38 The Washington Supreme Court accepted review of *Keogan*, and the estate mistakenly asks that we rely on *Keogan*'s lead opinion as support for its position in this case. But the Supreme Court's decision in *Keogan* was split on the several issues presented in that appeal. The lead opinion spoke for a majority only on the issue of whether the trial court should have found negligence as a matter of law for the defendant's failure to administer an EKG to Mr.

Keogan upon his presentation at the hospital emergency room. *See* 95 Wn.2d at 331-32 (Hicks, J., concurring in part, dissenting in part).

¶39 On the informed consent issue, it was Justice Hicks' opinion that spoke for a five-member majority of the court. That opinion held:

> By . . . focusing on the diseased heart to the exclusion of everything else, the majority seizes upon a suspicion by Dr. Snyder of a possibility that Keogan may have angina pectoris to decree that the informed consent doctrine as applied in *Gates v. Jensen*, 92 Wn.2d 246, 595 P.2d 919 (1979), controls here. In *Gates*, the court held that a physician has a duty of disclosure whenever he becomes aware of a bodily abnormality which may indicate risk or danger, whether or not the diagnosis has been completed.
>
> The Court of Appeals held that no duty to inform had yet arisen in this case because when "there is no diagnosis nor diagnostic procedure involving risk to the patient, there is nothing the doctor can put to the patient in the way of an intelligent and informed choice." *Keogan* [, 22 Wn. App. at 370]. Under the circumstances of this case, I agree with the Court of Appeals.

95 Wn.2d at 329-30 (Hicks, J., concurring in part, dissenting in part).[1]

¶40 Dr. Sauerwein argues that *Gates* does not apply to this case because it is distinguishable; according to Dr. Sauerwein, Ms. Gates' ophthalmologist was aware of an abnormality and Dr. Sauerwein was not. In our view, however, both physicians were aware of test results suggesting an abnormality. But based on other information from or about the patient, both concluded that the test results could reasonably be discounted as inconclusive, supporting no diagnosis and no immediate risk. We do not

---

[1] We note that the Supreme Court granted reconsideration in the matter on April 9, 1981. The case was thereafter dismissed by stipulation of the parties on June 23, 1981. *See* 95 Wn.2d at 332.

agree with Dr. Sauerwein that *Gates* is clearly distinguishable from the present case.

¶41 We conclude, however, that *Gates* has either been abrogated or limited to its facts by *Keogan,* or has been overruled sub silentio in light of the Supreme Court's decision in *Backlund* and its denial of review of *Wilfac, Burnet,* and *Bays.* A later holding overrules a prior holding sub silentio when it directly contradicts the earlier rule of law. *Lunsford v. Saberhagen Holdings, Inc.,* 166 Wn.2d 264, 280, 208 P.3d 1092 (2009). And see *Gustav v. Seattle Urological Associates,* 90 Wn. App. 785, 790, 954 P.2d 319, *review denied,* 136 Wn.2d 1023 (1998), in which a two-member majority—over a dissent on this issue—held that "a physician's failure to diagnose a condition is a matter of medical negligence, not a violation of the duty to inform," and "[t]he duty to disclose does not arise until the physician becomes aware of the condition by diagnosing it." Once again, the Supreme Court denied review in *Gustav.*

¶42 Accordingly, the trial court properly dismissed the estate's informed consent claim on the basis that Dr. Sauerwein's failure to diagnose presented a cause of action for medical negligence only.

¶43 Affirmed.

SWEENEY and KULIK, JJ., concur.

Review granted at 177 Wn.2d 1008 (2013).