FILED
SEPT 22, 2016
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ESTATE OF JOAN R. EIKUM<br>By and through its Personal<br>Representative, JOHN J. EIKUM, and<br>JOAN R. EIKUM, By and through her<br>Personal Representative, | )<br>)<br>)<br>)<br>)<br>) | No. 32934-8-III |
| Appellants, | )<br>) | UNPUBLISHED OPINION |
| v. | )<br>) | |
| SAMUEL JOSEPH, D.O., SPOKANE<br>RESPIRATORY CONSULTANTS, | )<br>)<br>) | |
| Respondents. | ) | |

KORSMO, J. — The estate of Joan Eikum (Estate) appeals from an adverse jury

verdict in its medical malpractice action against Dr. Samuel Joseph. Concluding that the

trial court correctly refused to instruct the jury on an informed consent theory and that the

Estate has not shown any prejudicial error, we affirm.

FACTS[1]

Upon the retirement of her primary physician, Dr. Joseph treated Ms. Eikum for

the last four years of her life. She already suffered from diabetes when referred to Dr.

_____

[1] In light of the review standards governing the primary issue, we state the facts primarily from the Estate's view of the case, recognizing that Dr. Joseph and his experts saw them in a different light.

Joseph. In October 2008, Dr. Joseph detected a bruit in Ms. Eikum's carotid artery.[2] A bruit is a sound caused by turbulence of the blood as it moves through the body. When heard in the neck, it can signify a narrowing of the carotid artery (carotid stenosis), but it can also signify narrowing of the aortic valve in the heart (aortic stenosis). Sound from the valve can be heard in the neck because the sound transmits through the artery. When aortic stenosis is heard directly from the heart it is more properly called a murmur.

Dr. Joseph sent Ms. Eikum for a carotid duplex examination. It revealed no evidence of stenosis (narrowing) of the carotid artery. The absence of carotid stenosis made aortic stenosis more likely. However, Dr. Joseph did not share any of this information with Ms. Eikum.

Around Thanksgiving 2008, Ms. Eikum fell while at home. Later that year, she passed out on a bed, laying back for five or six seconds and then coming up out of it. Around Christmas, Ms. Eikum slumped to the floor in the kitchen without reason, and then came up again. In January, she sprawled backwards while sitting on the toilet, coming back almost immediately. After this last incident, Ms. Eikum went to the emergency room.

The records of that visit indicated she suffered from syncope, the temporary loss of consciousness. There she underwent an electrocardiogram (EKG), a test that shows

---

[2] This was the only time the bruit was detected by any doctor. In subsequent examinations, neither Dr. Joseph nor any other doctor detected a bruit.

2

the rate of the heart, including whether there is interference with either the left or right ventricle. The EKG indicated tachycardia, which is an abnormally rapid heart rate. Following the emergency room visit, Ms. Eikum saw Dr. Joseph on January 21, 2009. Dr. Joseph was aware of the syncopal episodes, but did not know the cause of them. He ordered further pulmonary function tests, and also requested a Holter monitor.[3] His notes also indicated he planned to request a cardiology evaluation of Ms. Eikum.

Ms. Eikum saw Dr. Joseph again in March 2009 to obtain clearance for knee surgery. She desired to have her right knee replaced to eliminate some knee pain. She met with Dr. Joseph and he cleared her for surgery. However, Dr. Joseph did not indicate any heart-related concerns to Ms. Eikum, nor did he share that he did not know what was causing the syncope, or that he had considered ordering a cardiology consultation. He also did not discuss with her the possibility of getting an echocardiogram. An echocardiogram is a low-cost, non-invasive test that gives doctors a picture of how the heart valves are functioning and the condition of the heart muscle. With it, a doctor can assess the existence and severity of heart problems.

Dr. Joseph cleared Ms. Eikum for the elective knee surgery and she underwent the procedure in early April. The knee surgery exacerbated a pre-existing heart condition.

---

[3] A Holter monitor measures a person's heart rate. Ms. Eikum wore the monitor for the required 24 hour period. It showed that her heart rate exceeded 100 beats per minute for over nine hours, a sign of tachycardia. The results of the monitor were not shared with Ms. Eikum.

This caused a heart attack 36 hours after the surgery, which in turn required emergency bypass surgery. Her "cascade to death" began with the heart attack, which came when she was at risk while recovering from the knee surgery. The heart attack likely was caused when a small clot (or several of them) blocked an already narrowed blood vessel. Report of Proceedings (RP) at 823-824. She died later that month.

John Eikum, on behalf of his wife's estate, sued Dr. Joseph on theories of negligence and lack of informed consent. The case ultimately proceeded to jury trial.

The estate called several doctors to testify at trial, including standard-of-care witness Dr. Leslie Stricke. During defense cross-examination of Dr. Stricke, counsel brought up the revised cardiac risk index. It considers a patient's risk of cardiac complications from noncardiac surgery. Dr. Stricke indicated familiarity with the index. Counsel then brought forward a copy of "Harrison's text on internal medicine," which contained tables involving the index. After Dr. Stricke conceded that Harrison's is a "well-recognized treatise that physicians and internists use and rely on," counsel provided Dr. Stricke with a three-page excerpt of the book, including the cover page, title page, and page 50, which contained the tables in question. The excerpt contained the "revised cardiac risk index clinical markers," which counsel used to cross-examine the doctor. During the cross-examination, the full Harrison's text was present in the courtroom.[4]

---

[4] "The book's right here, correct? . . . Correct." RP at 442.

After counsel finished his cross-examination, Ms. Eikum's attorney was given an opportunity to look at the book in more detail, and used other portions of the book in redirect examination.

The cardiac risk index continued to be an issue at trial; both sides brought up the risk index with Ms. Eikum's next witness. Part way through defense cross-examination of this witness, Ms. Eikum's counsel requested to use the *Harrison's* text again. The book was no longer in the building and counsel asked Dr. Joseph's attorney to produce it. The trial court refused to order him to produce it unless he was going to use it again. At no point were additional excerpts of the book read into evidence with this witness. Instead, the cardiac risk index was discussed generally.

The cardiac risk index came up again with a defense expert, Dr. Darrel Potyk. This witness discussed the risk index generally, how it was created and how it evolved. He also discussed what the index indicates with regard to risk of a patient for surgery. The Estate did not raise a hearsay objection during Dr. Potyk's testimony.[5]

---

[5] Ms. Eikum's counsel did object on what appears to be a relevance theory: "Your Honor, just a continuing objection to the use of the revised cardiac risk index when it's not indicated as having been used." RP at 1043-1044. Dr. Joseph's counsel immediately objected "to counsel's speaking objection," and the trial court noted Ms. Eikum's objection but overruled it. RP at 1044.

After the plaintiff was done calling witnesses, Dr. Joseph moved for a judgment as a matter of law on the informed consent claim.[6] The court granted the motion, stating that "a provider cannot be liable for informed consent claims arising from the ruled out diagnosis" and that there had been "no testimony that Dr. Joseph knew of the heart condition and failed to inform her of the possible treatments." RP at 1126-1127.

Ms. Eikum requested, but the court declined to give, a series of five additional jury instructions. The two primary instructions were proposed instructions 10 and 14. The first proposed a "reasonable prudence" standard as an alternative basis for finding liability, while the second addressed the obligation to discuss conditions with a patient. Clerk's Papers (CP) at 28-32. Instead, the court gave the general health care negligence instruction:

> A health care professional owes to the patient a duty to comply with the standard of care for one of the profession or class to which he or she belongs.
>
> A physician who holds himself out as a specialist in internal medicine/pulmonary medicine has a duty to exercise the degree of skill, care, and learning expected of a reasonably prudent internal medicine/pulmonary medicine in the State of Washington acting in the same or similar circumstances at the time of the care or treatment in

---

[6] Witnesses were heard out of order during trial and, in order to limit the inconvenience to Dr. Joseph, the Estate decided not to call him during its case in chief with the understanding that it would not face scope of direct examination objections when cross-examining the doctor. RP 1008-1014. Rather than await the testimony, the Estate asked that the motions to dismiss be heard immediately. RP at 1102.

question. Failure to exercise such skill, care, and learning constitutes a breach of the standard of care and is negligence.

The degree of care actually practiced by members of the medical profession is evidence of what is reasonably prudent. However, this evidence alone is not conclusive on the issue and should be considered by you along with any other evidence bearing on the question.

CP at 138.

The Estate urged the jury to find that Dr. Joseph had violated the standard of care by failing to diagnose Ms. Eikum's heart condition and by failing to communicate with her. The doctor, in turn, told the jury that her symptoms were not indicative of heart disease. The jury sided with Dr. Joseph, concluding by a 10 to 2 vote that he was not negligent.

Judgment was entered on the verdict. The Estate then timely appealed to this court.

## ANALYSIS

The Estate presents three issues for consideration that we address in the following order. First, the Estate believes the trial court erred in dismissing the informed consent claim. Second, it contends the court erred in permitting the defense to reference a learned treatise. Finally, the Estate argues the court erred in not giving its requested instructions.

*Informed Consent Claim*

The Estate contends the court erred in dismissing its informed consent claim, arguing that the failure to diagnose the heart problem prevented Ms. Eikum from giving

7

her informed consent to the elective knee surgery. Assuming, without deciding, that the informed consent doctrine was available to the Estate in this "one off" circumstance, the trial court correctly determined that the evidence did not support the claim.

Well settled standards govern review of this issue. Appellate courts apply de novo review to a trial court decision to grant or deny a motion for judgment as a matter of law. *Alejandre v. Bull*, 159 Wn.2d 674, 681, 153 P.3d 864 (2007). Judgment as a matter of law is appropriate when, viewing the evidence in favor of the nonmoving party, there is substantial evidence to support a verdict for that party. *Sing v. John L. Scott, Inc.*, 134 Wn.2d 24, 29, 948 P.2d 816 (1997). "Substantial evidence" is evidence sufficient "to persuade a rational, fair-minded person that the finding is true." *Cantu v. Dep't of Labor & Indus.*, 168 Wn. App. 14, 21, 277 P.3d 685 (2012).

The Estate's specific argument is that by failing to inform Ms. Eikum of the unresolved symptoms and suggest use of an echocardiogram to investigate potential heart problems, she consented to the knee surgery without awareness of material facts. Br. of Appellant at 29. Although this seems to be merely a restatement of her negligence claim that the failure to diagnose the heart problem led to the fatal heart attack following surgery she should not have undergone, we need not address that point because the evidence does not support an informed consent claim. This issue requires a review of the case law governing informed consent theories involving a failure to diagnose.

8

Our statute provides four elements for an informed consent claim:

> (a) That the health care provider failed to inform the patient of a material fact or facts relating to the treatment;
>
> (b) That the patient consented to the treatment without being aware of or fully informed of such material fact or facts;
>
> (c) That a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts;
>
> (d) That the treatment in question proximately caused injury to the patient.

RCW 7.70.050(1).

The informed consent doctrine has its basis in common law, developing from the tort of assault and battery. The original theory was that a patient could not intelligently consent to a battery (the medical procedure) without a full understanding of any significant risks. *Keogan v. Holy Family Hosp.*, 95 Wn.2d 306, 313, 622 P.2d 1246 (1980). The doctrine was expanded to apply to situations where doctors failed to advise a patient of an abnormal condition[7] so the patient would be able to evaluate treatment options. *Miller v. Kennedy*, 11 Wn. App. 272, 282, 522 P.2d 852 (1974), *aff'd*, 85 Wn.2d 151, 530 P.2d 334 (1975). Informed consent was applied in the context of a failure to

---

[7] The failure to inform the patient of an abnormal condition presented a question of negligence. *Miller v. Kennedy*, 11 Wn. App. 272, 282, 522 P.2d 852 (1974). It was the need to decide on treatment options that moved this aspect of malpractice to the informed consent side of the ledger. *Id.* at 281-282.

diagnose in *Gates v. Jensen*, 92 Wn.2d 246, 595 P.2d 919 (1979). There an

ophthalmologist, confronted with high pressure readings in the plaintiff's eyes, failed to

advise the patient of the fact and of additional testing that might have confirmed the

presence of glaucoma. *Id.* at 248. The court concluded the plaintiff had been entitled to

an instruction on informed consent in addition to the instructions on negligence that had

been given to the jury. *Id.* at 250-251.

The legislature subsequently codified medical malpractice actions, including

informed consent claims. Chapter 7.70 RCW. Construing the statute, our court

subsequently concluded that in a failure-to-diagnose context, an action for breach of

informed consent was inappropriate. *Backlund v. Univ. of Wash.*, 137 Wn.2d 651, 661,

975 P.2d 950 (1999). "A physician who misdiagnoses the patient's condition, and is

therefore unaware of an appropriate category of treatments or treatment alternatives, may

properly be subject to a negligence action where such misdiagnosis breaches the standard

of care, but may not be subject to an action based on failure to secure informed consent."

*Id.* After *Backlund*, it was questionable whether or not *Gates* remained valid.

This court soon thereafter concluded that *Gates* either had been overruled or

limited to its facts. *Anaya Gomez v. Sauerwein*, 172 Wn. App. 370, 385, 289 P.3d 755

(2012), *aff'd*, 180 Wn.2d 610, 331 P.3d 19 (2014). While affirming this court, the

Washington Supreme Court concluded that *Gates* remained good law in situations where

a failure to inform arises during the diagnostic process. 180 Wn.2d at 623. However, the

10

majority[8] expressly stated that an informed consent claim cannot be based on the same facts as a negligence claim. *Id.* at 617-623. The court held that "when a health care provider rules out a particular diagnosis based on the circumstances surrounding a patient's condition, including the patient's own reports, there is no duty to inform the patient on treatment options pertaining to a ruled out diagnosis." *Id.* at 623.

We need not determine whether *Gates* would have applied to the facts of this case because *Backlund* expressly controls. Here, Dr. Joseph had ruled out heart trouble as the cause of bruit or the episodes of syncope. He expressly told the jury that after the Holter monitor test in January, his "final impression was no acute cardiopulmonary disease." RP at 1942. He testified that after examining Ms. Eikum in March, there was "no evidence of heart disease" behind the syncope incidents. RP at 1970. Whether or not Dr. Joseph erroneously ruled out heart disease was properly placed before the jury as a question of medical negligence. Both sides addressed the problem from that perspective and the jury rendered its verdict in favor of the doctor. Since the doctor had concluded that there was no heart disease, the trial court correctly applied *Backlund* and took the informed consent issue from the jury. While Dr. Joseph had not yet determined what had caused the incident, he had ruled out a heart condition as the cause.

---

[8] Justice Gonzalez, writing for four justices who concurred in the result, would not foreclose the possibility of both negligence and informed consent claims arising from the same facts. 180 Wn.2d at 627-630. However, it would be "rare" that both theories were available under the same facts. *Id.* at 630-631.

The trial court did not err in granting judgment as a matter of law on the question of informed consent.[9]

*Learned Treatise*

The Estate next argues that the trial court erred in its rulings concerning defense use of the cardiac risk assessment tool discussed in the learned treatise. We need not decide whether any error occurred since the Estate has not established any harm from the alleged errors.

Trial court evidentiary rulings are reviewed for abuse of discretion. *State v. Guloy*, 104 Wn.2d 412, 429-430, 705 P.2d 1182 (1985). Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). An appellate court will only consider the specific evidentiary objections that were presented to the trial court. *Guloy*, 104 Wn.2d at 422. An evidentiary error, like any nonconstitutional error, is harmless if, within reasonable probability, it did not affect the verdict. *State v. Zwicker*, 105 Wn.2d 228, 243, 713 P.2d 1101 (1986).

---

[9] The one complicating factor is that the trial testimony occurred after the motion to dismiss had been granted. As stated in footnote 6, in part this was because the Estate deferred its questioning of Dr. Joseph until the defense case as a matter of courtesy and also asked that the court rule immediately on the defense motion instead of awaiting the doctor's testimony. RP at 1008-1014, 1102. Under these circumstances, the ruling might have been premature, but it ultimately was correct.

At issue is the learned treatise exception to the hearsay rule. Hearsay is a "statement . . . offered in evidence to prove the truth of the matter asserted." ER 801(c). While there are numerous exceptions and exclusions, hearsay statements are typically inadmissible at trial. ER 802, 803, 804. ER 803(18) specifically provides that learned treatises may be read into evidence:

> To the extent called to the attention of an expert witness upon cross examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

The matter first arose when the defense brought up the index in cross-examination of Dr. Stricke. Defense counsel first asked whether Dr. Stricke was aware of "the revised cardiac risk index" and then more generally whether the doctor was aware of *Harrison's* text on internal medicine. RP at 441. Dr. Stricke answered in the affirmative to both questions. Counsel also asked if *Harrison's* was a "well-recognized treatise that physicians and internists use and rely on in the conduct of their medical practices." *Id.* Doctor Stricke again answered in the affirmative. RP at 442. Counsel then provided two tables excerpted from *Harrison's* to Dr. Stricke and questioned him about whether the conditions indicated in the tables existed in Ms. Eikum. *Id.* at 448-449. Although counsel only provided a photocopy of three of the pages of the book (cover, title page, and page 50, containing the tables), the entire book was present in the courtroom at this

13

time. RP at 442 ("The book's right here, correct? . . . Correct."). Further, Ms. Eikum's attorney was given an opportunity to look at the book during the break and had the witness read some more information from the book during redirect. RP at 470, 508. No objection was raised to this process. There was no error.

Other experts for both sides were asked about the risk index even though the *Harrison's* book was no longer in the courtroom. The plaintiff several times objected to examination of the witnesses concerning the risk index in the absence of the book, thus preserving this issue for review.[10] Even if we assume that it was erroneous to question the witnesses in the absence of the learned treatise, the Estate has not established prejudicial error. The evidence was properly admitted in accordance with the rule during the testimony of Dr. Stricke, and similar evidence came in through defense expert Dr. Potyk[11] without the Estate raising any hearsay objection.[12] The evidence was properly before the jury during the testimony of those two experts. Discussing the matter with the other witnesses, even in the absence of the treatise, did not add to or detract from to the evidence already properly before the jury. At most, even if improperly admitted, the other testimony was merely cumulative to the original evidence. Cumulative evidence is

---

[10] Appellant never raised a "best evidence" objection at trial. ER 1002. The attempt to do so now is unavailing since we will not consider an evidentiary argument not raised to the trial court. *Guloy*, 104 Wn.2d at 422.

[11] RP at 1033-1047.

[12] RP at 1016-1101.

14

No. 32934-8-III
*Estate of Joan R. Eikum, et al. v. Samuel Joseph, et al.*

not a basis for finding prejudicial error. *State v. Todd*, 78 Wn.2d 362, 372, 474 P.2d 542 (1970).

The Estate has not shown how the questioning of witnesses in the absence of the treatise affected the verdict. Accordingly, it has not demonstrated prejudicial error.

*Additional Jury Instructions*

Lastly, the Estate argues that the trial court erred by failing to give its five requested "additional" instructions. However, the instructions given by the trial court were proper and the Estate has not shown an entitlement to the additional instructions.[13] There was no error.

The trial court has discretion in the wording and number of jury instructions; this court reviews the trial court's decision for abuse of discretion. *Fergen v. Sestero*, 182 Wn.2d 794, 802, 346 P.3d 708 (2015). Instructions are sufficient if they are supported by substantial evidence, allow the parties to argue their theories of the case, and, when read as a whole, properly inform the jury of the applicable law. *Id.* at 803. An instruction that misstates the applicable law is reversible error if it causes prejudice. *Id.* The court need not give an instruction that is erroneous in any respect. *State v. Hoffman*, 116 Wn.2d 51, 110-111, 804 P.2d 577 (1991). The discretion afforded the trial court in the wording of

---

[13] We agree with the Estate that it properly preserved this issue. We need not address the defense arguments that the instructions are erroneous.

15

instructions means that it need not give additional instructions, even when they are correct, if the court's other instructions are sufficient. *Gammon v. Clark Equip.*, 104 Wn.2d 613, 617, 707 P.2d 685 (1985).

The Estate's argument founders on this latter point. Neither party contends the instructions given by the trial court were erroneous in any manner. Assuming that the Estate's proposed instructions were correct statements of the law, it has failed to establish that any of them were *necessary* in the sense that the Estate could not argue its theory of the case without them. The court's instructions did allow the Estate to argue its case. The five instructions all addressed the standard of care in one manner or another. Two of the instructions involved the failure to order additional tests, while the other three addressed alleged failures of Dr. Joseph to communicate with Ms. Eikum concerning diagnosis and treatment. The general negligence instruction given by the court allowed the Estate to make its arguments on these points. It put forth its theory of the case concerning all of these topics and the jury was able to consider them.

A party is only deprived of its theory of the case if the court's instructions do not allow it to argue the theory. *Fergen*, 182 Wn.2d at 803. The court's instructions did permit the Estate to argue its theory. Accordingly, they were adequate. The fact that some or all of the additional instructions might have been proper does not mean the trial court erred by refusing to give them.

16

No. 32934-8-III
*Estate of Joan R. Eikum, et al. v. Samuel Joseph, et al.*

The trial court did not abuse its discretion.

The judgment is affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

Korsmo, J.

WE CONCUR:

Fearing, C.J.

Lawrence-Berrey, J.

17