FILED
COURT OF APPEALS
DIVISION II

2014 SEP -9 PM 9: 21

STATE OF WASHINGTON

BY
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| KENNETH FLYTE, as Personal Representative of THE ESTATE OF KATHRYN FLYTE, on behalf of their son JACOB FLYTE, and as Personal Representative of THE ESTATE OF ABBIGAIL FLYTE, | No. 43964-6-II |
| Appellants, | |
| v. | PUBLISHED OPINION |
| SUMMIT VIEW CLINIC, a Washington corporation, | |
| Respondents. | |

BJORGEN, A.C.J. — Kenneth Flyte sued Summit View Clinic (Clinic) following the death of his wife Kathryn and their infant daughter Abbigail.[1] Kathryn had visited the Clinic while feeling ill during pregnancy and died shortly after from the H1N1[2] influenza virus. Abbigail, delivered by caesarean section while Kathryn lay comatose, died some months later. Kenneth based his claim primarily on the fact that the Clinic staff did not inform Kathryn about H1N1 or offer her Tamiflu, a drug often effective in treating the illness. A jury found by special verdict that the Clinic and its staff were not negligent and did not fail to provide informed consent, and the trial court denied Kenneth's subsequent CR 59 motion for a new trial.

---

[1] We refer to the Flytes by their first names for clarity. We intend no disrespect.

[2] Also known as the "swine flu."

Kenneth appeals, arguing that the trial court erred in denying the CR 59 motion because it improperly (1) admitted evidence of Kenneth's prior settlement with a different party, (2) instructed the jury concerning the prior settlement, (3) considered a juror's declaration concerning deliberations, and (4) instructed the jury as to the duty of informed consent. Because the trial court erred in admitting evidence of and instructing the jury about the prior settlement, and because its instruction on informed consent misstated the law, we reverse.

## FACTS

Kathryn began feeling ill on the evening of June 23, 2009, and visited the Clinic the morning of June 26. She was seven months pregnant. In the preceding months, the Clinic had received public health alerts from various authorities about a global pandemic of "swine flu," a potentially fatal illness caused by the H1N1 influenza virus. Although many of Kathryn's symptoms were consistent with influenza, and the public health alerts recommended treating pregnant women prophylactically with a drug known as "Tamiflu," the Clinic staff did not inform Kathryn about the pandemic or the available treatment. Ex. 5; Verbatim Report of Proceedings (VRP) (July 30, 2012) at 116-20, 129.

Kathryn's condition progressively deteriorated, and she received treatment from a number of different providers, including St. Joseph's Medical Center, part of the Franciscan Health System (Franciscan). Abbigail was delivered by caesarean section on June 30, after Kathryn had been placed in a medically induced coma. Kathryn died on August 11, 2009, and Abbigail died on February 21, 2010.

Kenneth sued the Clinic personally, as representative of the estates of Kathryn and Abbigail, and as guardian of his son, Jacob, alleging (1) medical negligence for failing to test for

H1N1 or administer Tamiflu prophylactically and (2) breach of the duty of informed consent for failing to inform Kathryn about the pandemic and the available treatment. During discovery, the Clinic learned that Kenneth had already settled with Franciscan for $3.5 million. The Clinic moved in limine for a ruling that evidence of the Franciscan settlement was admissible, requesting an instruction that the jury could use the evidence for the purpose of considering only whether Kenneth had already been fully compensated for his injuries. The trial court granted the motion.

During voir dire, a venire member disclosed that she worked in management at Franciscan. Kenneth sought to question the venire member about the settlement, but the Clinic objected and the court did not allow the question. Kenneth did not challenge the individual for cause, and she ultimately served on the jury as foreperson.

At trial, the physician who saw Kathryn the day she visited the Clinic, William Marsh, M.D., testified that "influenza wasn't something I had been concerned about clinically [because] I'd ruled that out." VRP (July 30, 2012) at 85. Marsh admitted, however, that he had no recollection of the events independent of the notes he had made shortly after the exam. The notes reflect that Marsh's "assessment" after the visit was that Kathryn had an upper respiratory infection. Ex. 14; VRP (July 26, 2012) at 53. Marsh testified that the "assessment" that appears on the exam notes, which he also called a "working diagnosis," represents "what I think the most likely diagnosis is for the reason they came in." VRP (July 26, 2012) at 47, 52. Marsh's notes also contain the following caveat: "Chills and sweats[:] not sure where com[]ing from[. E]xam normal[.] If gets worse to go to ER." Ex. 14.

3

No. 43964-6-II

At the close of the trial, over Kenneth's objection, the trial court instructed the jury that "[a] physician has no duty to disclose treatments for a condition that may indicate a risk to the patient's health until the physician diagnoses that condition." Clerk's Papers (CP) at 159. Also over Kenneth's objection, the court gave the Clinic's proposed limiting instruction concerning Kenneth's settlement with Franciscan. Both parties' counsel discussed the Franciscan settlement in opening statements and closing arguments, and the Clinic cross-examined Kenneth concerning it. The jury found by special verdict that the Clinic was not negligent and did not fail to provide informed consent.

Kenneth moved for a new trial under CR 59, based largely on the trial court's admission of the Franciscan settlement evidence and the challenged jury instructions. After considering argument from the parties and a declaration submitted by the jury foreperson, the court denied the motion. Kenneth appeals.

ANALYSIS

Kenneth argues that the trial court erred in denying his motion for a new trial for three reasons: (1) it erroneously admitted evidence of Kenneth's settlement with Franciscan and issued an improper limiting instruction to the jury regarding that settlement, (2) it erred in considering declarations from jurors concerning the deliberations in ruling on the motion for a new trial, and (3) the jury instruction concerning informed consent misstated the law, effectively preventing Kenneth from arguing his theory of the case. Concluding that the trial court erred by admitting evidence of and instructing the jury concerning the Franciscan settlement and by incorrectly instructing the jury on the law of informed consent, we reverse. Resolving the appeal on these grounds, we decline to address Kenneth's remaining claims of error.

4

No. 43964-6-II

## I. STANDARD OF REVIEW

Under CR 59(a) the court may vacate a verdict and grant a new trial for any one of the nine reasons listed in the rule, as long as it materially affects the substantial rights of a party. Among the nine reasons listed in CR 59(a) are:

> (1) Irregularity in the proceedings of the court, jury or adverse party, or any order of the court, or abuse of discretion, by which such party was prevented from having a fair trial;
>
> . . . .
>
> (8) Error in law occurring at the trial and objected to at the time by the party making the application; or
> (9) That substantial justice has not been done.

We generally will not reverse an order denying a motion for new trial absent abuse of discretion by the trial court. *See Aluminum Co. of Am. v. Aetna Cas. & Sur. Co. (ALCOA)*, 140 Wn.2d 517, 537, 998 P.2d 856 (2000). However, when, as here, the denial of a new trial is challenged based on an error of law, we review the denial de novo. *See Ayers v. Johnson*, 117 Wn.2d 747, 768, 818 P.2d 1337 (1991); CR 59(a).

We also review jury instructions for errors of law de novo. *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 860, 281 P.3d 289 (2012). Instructions are sufficient "'when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law.'" *Anfinson*, 174 Wn.2d at 860 (quoting *Bodin v. City of Stanwood*, 130 Wn.2d 726, 732, 927 P.2d 240 (1996)). The absence of any of these elements establishes error in the instruction. *Anfinson*, 174 Wn.2d at 860. An erroneous instruction requires reversal, however, only if it prejudices a party. *Anfinson*, 174 Wn.2d at 860. If the instruction contains a clear misstatement of law, the reviewing court must

5

presume prejudice, while the appellant must demonstrate prejudice if the instruction is merely misleading. *Anfinson*, 174 Wn.2d at 860.

## II. ADMISSION OF EVIDENCE OF THE SETTLEMENT WITH FRANCISCAN

The trial court admitted evidence concerning Kenneth's settlement with Franciscan based on an opinion in which Division One of our court interpreted RCW 7.70.080 to allow such evidence. *Diaz v. State*, 161 Wn. App. 500, 251 P.3d 249 (2011), *aff'd on other grounds*, 175 Wn.2d 457 (2012). On review, our Supreme Court held such evidence inadmissible in an opinion issued in *Diaz* six days after the trial court denied Kenneth's motion for a new trial. *Diaz*, 175 Wn.2d 457. Thus, the parties do not dispute that the trial court erred in admitting the evidence and giving the accompanying instruction. The Clinic instead argues that the error did not prejudice Kenneth as a matter of law because the jury did not find negligence.

Kenneth makes two independent arguments regarding prejudice: (1) the settlement evidence was inherently prejudicial, particularly because a management-level employee of Franciscan served on the jury as foreperson; and (2) the trial court's limiting instruction effectively commented on the evidence by suggesting that Kenneth may have already received sufficient compensation for the death of his wife and daughter. The Clinic counters that (1) Kenneth has waived any claim concerning the Franciscan employee by not challenging the juror for cause or making an adequate record of the reasons for a potential challenge; and (2) the erroneous admission of settlement evidence could not have prejudiced Kenneth because the trial court instructed the jury to consider only the evidence as to the amount of compensation, and the jury, having found no negligence, did not reach the issue of damages. We hold that the limiting instruction did not cure the prejudice we must presume from the erroneous admission of the

6

settlement evidence and that this error, consequently, was not harmless. With this holding, it is not necessary to reach the claimed improper comment on the evidence or the issue concerning the jury foreperson.

Both parties base their arguments on our Supreme Court's decision in *Diaz*, 175 Wn.2d 457. Diaz sued Dr. Neal Futran and Futran's employer, the University of Washington Medical Center, as well as Dr. Jayanthi Kini and the Medical Center Laboratory, for medical malpractice. Futran and the University settled. The *Diaz* court, after holding evidence of such a settlement inadmissible, affirmed Division One of our court on the ground that "a detailed examination of the record reveals that there was no prejudice as a matter of law." 175 Wn.2d at 474. The court reasoned that

> [t]here are only two possible ways the settlement evidence could have affected the outcome of this trial, and we can categorically rule out both of them. First, the jury could have used settlement evidence to change its assessment of damages. However, we can be certain that this did not occur here because the jury returned a defense verdict and did not even reach damages. Thus, as a matter of law, there was no prejudice based on damages. Second, the evidence could have affected the outcome if the jury used it to change its assessment of liability. But as a matter of law, this did not occur either. Washington courts have, for years, firmly presumed that jurors follow the court's instructions. [*Bordynoski v. Bergner*, 97 Wn.2d 335, 342, 644 P.2d 1173 (1982)]; *Gardner v. Spalt*, 86 Wash. 146, 149, 149 P. 647 (1915). . . . Here, the jury was specifically instructed not to consider settlement evidence in determining liability: "This evidence should not be used to either (a) assume the University of Washington or Dr. Futran acted negligently to cause damage to the plaintiffs, (b) excuse any liability you find on the part of Dr. Kini or MCL. . . . As a matter of law, we presume the jurors in this case followed this instruction. Accordingly, we hold that the settlement evidence here did not prejudice the jury's assessment of liability.

*Diaz*, 175 Wn.2d at 474-75. At first glance, this reasoning would appear to apply equally to the facts of this case: finding no negligence, the jury did not reach the damages issue, and the trial court instructed the jury that "[t]his evidence should not be used to assume that either Summit

7

No. 43964-6-II

View Clinic or St. Joseph Medical Center/Franciscan Medical Group acted negligently." Clerk's Papers (CP) at 163.

The circumstances here, however, differ from those in *Diaz* in a number of crucial ways. The *Diaz* court based its holding in part on the force of ER 408, which provides that

> evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.

175 Wn.2d 470-71. This rule aims in part to avoid the "potentially corrosive effect settlement evidence may have on a jury." *Northington v. Sivo*, 102 Wn. App. 545, 550, 8 P.3d 1067 (2000).

After pointing out that the court in *Northington* had also ultimately found the evidence improperly admitted there harmless, the *Diaz* court rejected Diaz's claim that the settlement evidence had such a corrosive effect:

> [T]he "corrosive" argument makes even less sense because the evidence was mentioned only once at trial (even then by the plaintiff's attorney), no evidence was admitted, and the jury was instructed not to consider the evidence by an instruction that the plaintiff specifically requested.

*Diaz*, 175 Wn.2d at 475.

Under each possible source of "corrosion" relied on in *Diaz*, the instruction below threatens prejudice much more emphatically than did the instruction in that case. First, the *Diaz* court found it significant that "[t]he error was an evidentiary ruling and no evidence was ever actually admitted under the ruling." 175 Wn.2d at 474. Diaz's counsel referred to the settlement in opening statement, but the defense never sought to admit any evidence of it. *Diaz*, 175 Wn.2d at 461.

8

Here, in contrast, Kenneth's counsel initially mentioned the settlement in opening statement, but the Clinic's counsel also mentioned it in its opening statement, cross-examined Kenneth about it, and discussed it at the end of closing argument. Unlike in *Diaz*, the trial court actually admitted the evidence, and that evidence played a significant role in the proceeding.

Next, the *Diaz* court expressly recognized that the settlement evidence could have affected the outcome if the jury used it to change its assessment of liability. 175 Wn.2d at 474. The court held that this source of prejudice was adequately addressed by the instructions in *Diaz*, though, specifically noting clause (b) in the following instruction:

> You have heard evidence that the University of Washington and Dr. Neal Futran were once parties to this litigation and later entered into a settlement with the plaintiffs, paying the plaintiffs $400,000. This evidence should not be used to either (a) assume the University of Washington or Dr. Futran acted negligently to cause damage to the plaintiffs, (b) excuse any liability you find on the part of Dr. Kini or MCL, or (c) reduce the amount of any damages you find were caused by Dr. Kini or MCL. By giving you this instruction, the court does not mean to instruct you for which party your verdict should be rendered.

175 Wn.2d 473.

The corresponding instruction given here, however, wholly lacks this curative muscle. It reads in full:

> You have heard evidence that St. Joseph Medical Center/Franciscan Medical Group entered into a settlement with the plaintiff, agreeing to pay the plaintiff $3,500,000. This evidence is admissible for the limited purpose of demonstrating that the plaintiff may have already been compensated for the injury complained of from another source. This evidence should not be used to assume that either Summit View Clinic or St. Joseph Medical Center/Franciscan Medical Group acted negligently to cause damage to plaintiff.

CP at 163. This instruction differs from the instruction in *Diaz* in two significant ways. First, unlike in *Diaz*, the instruction states that the settlement could be used to show that Kenneth

already had been compensated. This created a risk that the jury would find no liability because it believed that Kenneth needed no additional compensation.

Second, the instruction admonishes the jury not to use the settlement evidence to assume negligence on the part of Franciscan or the Clinic, but does not prevent the jury from using the settlement evidence to *excuse* liability by the Clinic. The instruction in *Diaz* expressly stated that the settlement evidence could not be used to excuse the remaining defendants' liability. The failure to include that language here created a risk that the settlement evidence would change the jury's assessment of liability.

The Clinic contends that certain other instructions cured any potential prejudice caused by the instruction at issue.[3] Specifically, it argues that the standard instruction on multiple proximate causes, which informs the jury that "it is not a defense that the act of some other person or entity who is not a party to this lawsuit may also have been a proximate cause" of the injury, and instructions 18 and 21, which informed the jury that, in the event it returned a verdict for Kenneth, damages must include certain undisputed amounts, dispelled any threat of prejudice. CP at 162. These instructions do not necessarily help the Clinic, however, because they also show that, in the event the jurors concluded that Kenneth had established his claim but

---

[3] The Clinic contends that
> "[a]s a matter of law, settlement evidence cannot have been prejudicial if a jury, instructed to consider settlement evidence only on the issue of damages, returns a defense verdict based on a finding of no negligence and does not reach the issue of proximate causation much less the issue of damages."

Br. of Resp't at 16 (quoting *Diaz*, 175 Wn.2d at 474). This mischaracterizes the holding in *Diaz*. As set forth above, the *Diaz* court relied on the fact that the jury did not reach damages only for the question of whether the improper settlement evidence prejudiced Diaz as to damages. 175 Wn.2d at 474. As also noted above, the court also considered whether the evidence prejudiced Diaz as to negligence, relying on Diaz's limiting instruction, a much broader instruction than that given here, to hold that it did not. 175 Wn.2d at 474-75.

did not deserve any further compensation, the most straightforward way they could answer the verdict questions, according to the court's instructions, and still award Kenneth nothing would be to answer "no" to the questions concerning negligence.

By allowing consideration of the settlement, the trial court's instruction set out above contained a clear misstatement of law under *Diaz*. With that, *Anfinson*, 174 Wn.2d at 860, requires us to presume prejudice. That prejudice is the same as that recognized in *Diaz*, that the settlement evidence could lead a jury to excuse negligence on the part of the defendant. 175 Wn.2d at 474-75. None of the reasons for rejecting the claim of prejudice in *Diaz* appear in Kenneth's case. Here the evidence was admitted and referred to repeatedly, including at the end of the Clinic's closing argument; and, most importantly, the instruction given did not include one of the key provisions that the *Diaz* court found to have cured any prejudice. The limiting instruction, unlike the instruction proposed by Diaz, did not cure the prejudice, and the error in allowing consideration of the settlement therefore merits reversal.

## III. THE TRIAL COURT'S DUTY TO DISCLOSE INSTRUCTION

Kenneth also assigns error to the trial court's jury instruction 11, which informed the jury that "[a] physician has no duty to disclose treatments for a condition that may indicate a risk to the patient's health until the physician diagnoses that condition." CP at 159. Kenneth contends that this instruction misstated the law and "grafted an extra burden of proof upon the Flyte family with respect to the informed consent claim." Br. of Appellant at 29-30. The Clinic maintains that the instruction correctly stated the law and argues that Kenneth bases his argument on outdated case law.

The dispute centers on the following holding of our Supreme Court:

11

> *The patient's right to know is not confined to the choice of treatment once a disease is present and has been conclusively diagnosed.* Important decisions must frequently be made in many nontreatment situations in which medical care is given, including procedures leading to a diagnosis, as in this case. These decisions must all be taken with the full knowledge and participation of the patient. The physician's duty is to tell the patient what he or she needs to know in order to make them. The existence of an abnormal condition in one's body, the presence of a high risk of disease, and the existence of alternative diagnostic procedures to conclusively determine the presence or absence of that disease are all facts which a patient must know in order to make an informed decision on the course which future medical care will take.

*Gates v. Jensen*, 92 Wn.2d 246, 250-51, 595 P.2d 919 (1979) (emphasis added). As Kenneth points out, this holding directly contradicts the trial court's instruction and has never been overruled.

The Clinic is also correct, however, that the *Gates* court based its holding on law that predated the legislature's codification of informed consent law and that a number of subsequent opinions appear to have limited its holding. We first address the effect of the informed consent statute, then consider the *Gates* holding in light of subsequent decisions.

The informed consent statute prescribes four necessary elements of proof for a successful claim:

> (a) That the health care provider failed to inform the patient of a material fact or facts relating to the treatment;
> (b) That the patient consented to the treatment without being aware of or fully informed of such material fact or facts;
> (c) That a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts;
> (d) That the treatment in question proximately caused injury to the patient.

RCW 7.70.050(1). The statute defines material facts as those "a reasonably prudent person in the position of the patient or his or her representative would attach significance to [in] deciding

12

whether or not to submit to the proposed treatment."[4] RCW 7.70.050(2). This statute, on its face, does not impose the requirement at the heart of instruction 11, that the duty to disclose arises only after the provider has diagnosed a particular condition.

Also of significance, the requirements of RCW 7.70.050(1) expanded the duty to disclose from that fixed by prior law. Under the statute, the provider must have failed to inform the patient of a material fact relating to the treatment. RCW 7.70.050(1)(a). Under the law prior to its adoption, the duty to disclose extended only to "grave risks of injury." *ZeBarth v. Swedish Hosp. Med. Ctr.*, 81 Wn.2d 12, 23, 499 P.2d 1 (1972). If the legislature had intended to impose the additional requirement that no duty to disclose arises absent a health care provider's diagnosis of a particular condition, it would not likely have done so through a bill that expanded the scope of the duty to disclose without mentioning such a requirement.[5] Therefore, we reject the Clinic's contention that the adoption of the informed consent statute limited the duty to disclose to situations where a health care provider has conclusively diagnosed an illness.

As for the continuing viability of the *Gates* holding in light of subsequent precedents, Division Three of our court discussed the question extensively in a recent case, *Anaya Gomez v.*

---

[4] The absence of treatment qualifies as "treatment" within the meaning of the statute. RCW 7.70.050(3)(d); *see also Keogan v. Holy Family Hosp.*, 95 Wn.2d 306, 318-19, 622 P.2d 1246 (1980) (noting that "'treatment' encompasses all aspects of patient care, including the doctor's resolve to do nothing about medical abnormalities in the patient's condition").

[5] For a scholarly discussion of Washington's informed consent law shortly after the enactment of RCW 7.70.050, including the apparent inconsistency between *Gates* and subsequent cases, see Edwin Rauzi, *Informed Consent in Washington: Expanded Scope of Material Facts That the Physician Must Disclose to His Patient*, 55 WASH. L. REV. 655 (1980).

No. 43964-6-II

*Sauerwein*, 172 Wn. App. 370, 381-85, 289 P.3d 755 (2012), *aff'd*, 180 Wn.2d 610, --- P.3d --- (2014), 2014 WL 2815779 (Wash. June 19, 2014), ultimately concluding that

> *Gates* has either been abrogated or limited to its facts by *Keogan* [*v. Holy Family Hospital*, 95 Wn.2d 306, 622 P.2d 1246 (1980)], or has been overruled sub silentio in light of the Supreme Court's decision in *Backlund* [*v. University of Washington*, 137 Wn.2d 651, 975 P.2d 950 (1999)] and its denial of review of [*Thomas v. Wilfac, Inc.*, 65 Wn. App. 255, 828 P.2d 597 (1992)], *Burnet* [v. *Spokane Ambulance*, 54 Wn. App. 162, 772 P.2d 1027 (1989)], and *Bays* [v. *St. Luke's Hospital*, 63 Wn. App. 876, 825 P.2d 319 (1992)].

In affirming that decision, however, our Supreme Court expressly rejected the view that subsequent decisions had overruled *Gates*:[6]

> [W]e affirm the Court of Appeals but point out that *Gates* has not been overruled. *See Anaya Gomez*, 172 Wn. App. at 385. *Backlund* and *Keogan* state the general rule of when a plaintiff can make an informed consent claim. The *Gates* court allowed the informed consent claim based on a unique set of facts that are distinguishable from this case. Under *Gates*, there may be instances where the duty to inform arises during the diagnostic process, but this case does not present such facts. The determining factor is whether the process of diagnosis presents an · informed decision for the patient to make about his or her care.

*Anaya Gomez*, 180 Wn.2d at ¶ 37. Thus, even a health care provider who has not conclusively diagnosed a particular illness may have a duty to disclose information related to the treatment of that illness if the information is reasonably needed by the patient to make an informed decision about treatment. The categorical statement in instruction 11 that "[a] physician has no duty to disclose treatments for a condition that may indicate a risk to the patient's health until the physician diagnoses that condition," not only flatly contradicts the holding in *Gates*, it misstates the law as clarified by our Supreme Court in *Anaya Gomez*. CP at 159

---

[6] The Supreme Court decided *Anaya Gomez* after the parties had filed their briefs in this appeal. We ordered the parties to submit supplemental briefing addressing the effect of the *Anaya Gomez* decision.

14

*Backlund*, a precedent on which our Supreme Court relied in *Anaya Gomez*, provides

perhaps the strongest support for the Clinic's position:

> A physician who misdiagnoses the patient's condition, and is therefore unaware of an appropriate category of treatments or treatment alternatives, may properly be subject to a negligence action where such misdiagnosis breaches the standard of care, but may not be subject to an action based on failure to secure informed consent.

*Backlund*, 137 Wn.2d at 661 (footnote omitted). In a footnote, the *Backlund* court added that

> [i]n the traditional informed consent case, a physician diagnoses the patient's condition and recommends a course of treatment. The physician is liable under RCW 7.70.050, however, if the physician fails to disclose the attendant risks of such treatment. Similarly, the physician is liable if the physician fails to disclose other courses of treatment, including no treatment at all, as options upon which the patient makes the ultimate choice.
>
> Where a physician arguably misdiagnoses the patient's condition and recommends a course of treatment for the patient based on that misdiagnosis, the physician is properly liable in negligence for the misdiagnosis if such diagnosis breaches the standard of care. But the physician should not be additionally liable under RCW 7.70.050 for a condition unknown to the physician. For example, a physician who misdiagnosed a headache as a transitory problem and failed to detect a brain tumor may be guilty of negligence for the misdiagnosis, but it seems anomalous to hold the physician culpable under RCW 7.70.050 for failing to secure the patient's informed consent for treatment for the undetected tumor.

137 Wn.2d at 661 n.2 (citations omitted). The *Backlund* court, however, expressly declined to

rest its decision on this reasoning because in that case the defendant physician had correctly

diagnosed the problem and knew about the alternative treatment not disclosed. 137 Wn.2d at

662.

The *Backlund* dictum supplies little guidance in the resolution of this appeal. To begin

with, Kenneth never argued that the Clinic breached the standard of care by failing to diagnose

H1N1. Kenneth contended that the Clinic failed to provide informed consent by not telling

Kathryn about the H1N1 epidemic and Tamiflu and that it breached the standard of care by not

considering the possibility of H1N1 and offering Tamiflu as a prophylactic measure. Indeed, undisputed expert testimony at trial indicated that no test could detect H1N1 within the time that Tamiflu could most effectively treat the disease.

*Backlund*, furthermore, involved facts that differed in important respects from those presented here. As noted, the doctor in *Backlund* correctly diagnosed the condition and was aware of the treatment not disclosed, but thought that the alternative treatment posed too great a risk to the patient. The Supreme Court's decision turned on whether "[a] reasonably prudent patient would not have opted for the [alternative treatment], even if the reasonably prudent patient had been informed of all the pertinent risks of no treatment." *Backlund*, 137 Wn.2d at 668.

Here, in contrast, Kathryn showed symptoms arguably consistent with H1N1, and she was pregnant. The Clinic had received public health alerts warning of H1N1 and recommending that pregnant women with symptoms of it be immediately treated with Tamiflu as a prophylactic measure. The Clinic's failure to inform Kathryn about the pandemic or the available treatment has little in common with the actions of the doctor in *Backlund*.

The *Anaya Gomez* court also relied on its prior decision in *Keogan*, 95 Wn.2d 306. Justice Hicks's separate opinion in *Keogan*, signed by five justices and controlling on the informed consent issue, *see Anaya Gomez*, 180 Wn.2d at ¶ 25 n.4, addressed the relevant holding from *Gates* as follows:

> By thereafter focusing on the diseased heart to the exclusion of everything else, the majority seizes upon a suspicion by Dr. Snyder of a possibility that Keogan may have had angina pectoris to decree that the informed consent doctrine as applied in *Gates v. Jensen*, 92 Wn.2d 246, 595 P.2d 919 (1979), controls here. *In Gates, the court held that a physician has a duty of disclosure whenever he becomes*

16

*aware of a bodily abnormality which may indicate risk or danger, whether or not the diagnosis has been completed.*

The Court of Appeals held that no duty to inform had yet arisen in this case because when "there is no diagnosis nor diagnostic procedure involving risk to the patient, there is nothing the doctor can put to the patient in the way of an intelligent and informed choice." *Keogan v. Holy Family Hosp.*, 22 Wn. App. 366, 370, 589 P.2d 310 (1979). *Under the circumstances of this case, I agree with the Court of Appeals.*

*Keogan*, 95 Wn.2d at 329-30 (emphasis added). The opinion of the Court of Appeals, with which Justice Hicks's opinion expressly agreed, treated the question as follows:

The crucial factor involved in the doctrine of informed consent is the reasonably foreseeable risk to the patient of a proposed course of treatment. *Respondent contends that since Dr. Snyder had not yet made a diagnosis, there was no duty to inform. We disagree. Even if a doctor has not specifically diagnosed a medical problem, if the doctor embarks on a diagnostic procedure which entails a reasonably foreseeable risk to the patient, the patient must be informed of the risk and possible alternatives. See Mason v. Ellsworth,* [3 Wn. App. 298, 474 P.2d 909 (1970)]. Conversely, if there is no diagnosis nor diagnostic procedure involving risk to the patient, there is nothing the doctor can put to the patient in the way of an intelligent and informed choice. *Meeks v. Marx*, 15 Wn. App. 571, 550 P.2d 1158 (1976).

*Keogan*, 22 Wn. App. at 369-70 (emphasis added).

Thus, the controlling opinion in *Keogan* acknowledged the *Gates* holding and rejected the proposition that no duty to disclose arises until a diagnosis has been made. Justice Hicks's opinion establishes that, where the situation presents an "intelligent and informed choice" to put to the patient, such as "a diagnostic procedure involving risk to the patient," health care providers have a duty to disclose material facts. *Keogan*, 22 Wn. App. at 369-70. *Keogan* thus confirms the error in instruction 11.

The question remains whether the error merits reversal. As discussed, because the challenged instruction contains a clear misstatement of the law, we must presume prejudice.

17

*Anfinson*, 174 Wn.2d at 860. If Kenneth had no valid informed consent claim, however, then the erroneous instruction could not have prejudiced him.

Kathryn's medical situation arguably presented an informed choice for her to make within the meaning of *Anaya Gomez*, 180 Wn.2d at ¶ 29. That is, she had to decide whether to submit to the proposed course of treatment, specifically, to wait for further developments and go to the emergency room if the symptoms worsened. The jury could reasonably have concluded that, in light of her symptoms, a reasonable person in Kathryn's position would, in making that decision, have attached significance to information regarding the extreme danger H1N1 posed to pregnant women and the availability of suitable prophylactic measures. Indeed, without the information contained in the public health alerts, Kathryn had no way of knowing that she had any option other than to wait and see or that she faced potentially serious consequences by so doing. Thus, on their face these facts would appear to give rise to a legitimate informed consent claim under RCW 7.70.050.

In *Anaya Gomez*, however, our Supreme Court specified that "when a health care provider rules out a particular diagnosis based on the circumstances surrounding a patient's condition, including the patient's own reports, there is no duty to inform the patient on treatment options pertaining to a ruled out diagnosis." 180 Wn.2d at ¶ 30. The Clinic contends that this holding forecloses Kenneth's informed consent claim because Marsh, the doctor who saw Kathryn, testified that he had ruled out any type of influenza, let alone H1N1, as a diagnosis. We disagree.

Although Marsh did say he had ruled out influenza, he also testified that he had no independent memory of seeing Kathryn the day she went to the Clinic and admitted that he based

18

his testimony entirely on the progress notes he had made following her visit. Those notes do not establish that Marsh had definitively ruled out influenza as a possible diagnosis. On the contrary, the terms "assessment" or "working diagnosis," together with the notation "[c]hills and sweats[:] not sure where com[]ing [from[. E]xam normal[.] If gets worse to go to ER," give rise to a reasonable inference that Marsh had only tentatively settled on an upper respiratory infection as the cause of Kathryn's complaints and that he remained open to the possibility that she in fact suffered from a more serious illness. VRP (July 26, 2012) at 47, 52; Ex. 14. Kenneth, furthermore, presented testimony from Kathryn's father, John Brehan, who had accompanied Kathryn into the exam room and who recalled Marsh saying that she had "influenza." VRP (July 16, 2012) at 22.

Whether Marsh had ruled out influenza thus presented a disputed question of fact. If the jury believed that Marsh had not ruled out influenza, it could properly have considered Kenneth's informed consent claim under the rule articulated in *Anaya Gomez*. Under the trial court's erroneous instruction 11, however, the jury could only have considered the informed consent claim if it found that Marsh had conclusively diagnosed influenza as the cause of Kathryn's distress, something that Kenneth had never alleged.

Under the informed consent statute, a key question for the finder of fact was whether the Clinic failed to disclose "material . . . facts relating to the treatment," namely, facts to which a reasonably prudent person in Kathryn's position would have attached significance in deciding whether or not to submit to the proposed treatment. RCW 7.70.050(1), (2). Under *Gates* and *Anaya Gomez*, this duty to disclose is not confined to the period after a conclusive diagnosis has

19

No. 43964-6-II

been made. *Gates*, 92 Wn.2d at 250-51; *Anaya Gomez*, 180 Wn.2d at ¶ 29. Case law after *Gates* does not question the application of its rule to the circumstances presented here.

A trial court errs by giving an instruction that removes a disputed issue of fact from the jury's consideration. *Sewell v. MacRae*, 52 Wn.2d 103, 106, 323 P.2d 236 (1958). Instruction 11 did precisely that in a manner contradicting both RCW 7.70.050 and *Gates*. As noted, when an instruction contains a clear misstatement of law, we must presume prejudice. *Anfinson*, 174 Wn.2d at 860. We hardly need to apply this presumption in this case because the instruction given plainly prejudiced Kenneth by foreclosing his primary theory of the case. Thus, this instructional error also merits reversal.

Because the trial court erred in admitting evidence of and instructing the jury about the prior settlement, and because its instruction on informed consent misstated the law, we reverse.

Bjorgen, A.C.J.

BJORGEN, A.C.J.

We concur:

Hunt, J.

HUNT, J.

Maxa, J.

MAXA, J.

20